

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

---

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

July 6, 2023

**BY ECF**
The Honorable Ronnie Abrams
United States District Judge
40 Foley Street
New York, NY 10007

  Re: *United States v. James Hernandez*, 23 Cr. 29 (RA)

Dear Judge Abrams:

  On July 11, 2023, defendant James Hernandez ("Hernandez," or the "defendant") will appear for sentencing after having been held responsible by plea agreement for the distribution of four kilograms of fentanyl and eighteen kilograms of cocaine. For the reasons set forth below, the Government submits that a substantial sentence of imprisonment within the United States Sentencing Guidelines range of 135 to 168 months' imprisonment would be sufficient, but not greater than necessary, to serve the purposes of sentencing.

**I.  Background**

  On or about November 1, 2022, law enforcement agents (the "Agents") were conducting surveillance of James Hernandez ("Hernandez") who was, at the time, a target of a narcotics and money laundering investigation. While conducting surveillance, the Agents observed Hernandez driving a 2021 Jeep Grand Cherokee (the "Jeep"). At approximately 6:49 p.m., Hernandez parked the Jeep in the vicinity of 2130 White Plains Rd. Bronx, NY, where an individual later identified as Charles Guy, a/k/a "Billy Guy," ("Guy") entered the front passenger seat of the Jeep. Guy remained in the Jeep for approximately two to three minutes before exiting the Jeep with a brick of fentanyl (the "Brick") hidden in his pants. Guy then entered the front passenger seat of a white Toyota 4Runner (the "4Runner"). The Agents followed the 4Runner to a gas station in the Bronx, New York (the "Gas Station"). Once at the Gas Station, the Agents saw a third individual ("CC-1") enter the rear passenger seat of the 4Runner.

  After observing CC-1 enter the 4Runner, the Agents approached the vehicle. While engaging with the driver of the 4Runner ("CC-2"), one of the Agents ("Agent-1") observed the brick of fentanyl on the backseat of the 4Runner. The Agents ordered the occupants of the 4Runner to exit the 4Runner while the Agents conducted a search of the vehicle. The Agents recovered the Brick, which was emblazoned with a distinct stamp, as well a white substance wrapped in a purple latex glove. Stamps like that on the below-depicted brick are typically affixed by narcotics traffickers as a way to "brand" their product. The Agents placed Guy under arrest.

Shortly thereafter, at approximately 8:49 p.m., the Agents observed the Jeep parked outside a commercial establishment on Middletown Road in Bronx, New York. At 11:45 p.m., the Agents saw Hernandez exit the commercial establishment and enter the Jeep. The Agents followed the Jeep as it departed the commercial establishment, conducted a traffic stop, and placed Hernandez under arrest for his role in the narcotics transaction described above.

███████████████████████████████████████████████████████████████ law enforcement recovered multiple kilogram bricks of fentanyl and cocaine, a hydraulic press of the kind used to prepare narcotics for packaging and sale, and numerous packaging paraphernalia, including but not limited to plastic bags, rubber bands, stamps, digital scales, strainers, respirator masks, sifters, and vacuum sealing machines. Law enforcement also recovered approximately $100,000 in United States currency and an automatic money counter.

 

Law enforcement agents also seized and searched, ████████████, three of Hernandez's cellphones. The searched revealed the defendant's extensive involvement in narcotics trafficking. Specifically:

- Cellphone-1 is an Apple iPhone 13 with a call number ending in 8559 and contains, among other things:

    o A conversation with a user saved as "Jiulie" where the defendant appears to be brokering a kilogram quantity narcotics transaction;

- o A conversation with a user saved as "Tun tun" which appears to be regarding a fentanyl transaction. "Tun Tun" is Jordany Cruz — an individual recently charged in SDNY while in connection with his distribution of fentanyl. *See United States v. Ornelas*, et al, 22 Cr. 552 (JMF).

- o As depicted below, Cellphone-1 contains an image of what appears to be six kilogram-size "bricks" of narcotics — likely fentanyl or cocaine —as well as a phone showing the current date and time and a dollar bill. The image is saved in the "DCIM" folder of the phone where the phone stores photographs and videos it has taken, indicating that the photograph was likely taken by the defendant in the course of communicating with his co-conspirators while negotiating a deal.



- Cellphone-2 is an iPhone 12 Pro Max with a call number ending in 7286 and appears to be the phone on which the defendant maintained financial information. For example, as depicted below, in the notes application, there is a note saved that appears to be a ledger, detailing payments from April 22 to "Mex" and "Julie," among others.

```
Mex 77000 4/22
-12,500
-5500
-15,000
New bal= 44,000
-7000 western
-14500 Julie
-30,000 chino.
-25,000 chino
-10,0000
-3000
```

- Celllphone-3 is an iPhone 12 with a call number ending in 3030. Most of the communications on Cellphone-3 appear to have been completed using the end-to-end encrypted application Signal, including communications with a user who appears to be based in Mexico.

II.     **The Guilty Plea, the Guidelines Calculation, and the Defendant's Criminal History**

On February 27, 2023, the defendant waived indictment and pleaded guilty to a one-count information charging him with fentanyl and cocaine trafficking. The plea agreement contained a Guidelines stipulation that the defendant is at offense level 33 and criminal history category I, leading to a stipulated Guidelines range of 135 to 168 months' imprisonment (the "Stipulated Guidelines Range"). Because the defendant was permitted to plead to a lesser-included offense in violation of 21 U.S.C. § 841(b)(1)(B), his sentence carries a mandatory minimum term of 60 months' imprisonment.

In its Presentence Investigation Report, the Probation office reached the same Guidelines calculation as the parties. Probation has recommended the Court impose a Guidelines sentence of 135 months' incarceration, to be followed by four years' supervised release.

The defendant has eight prior criminal convictions, only one of which results in criminal history points. The defendant sustained his first criminal conviction in 1989—a youthful offender adjudication for criminal possession of a loaded firearm, for which he received a one-to-three-year term of imprisonment. Between 1991 and 1998, the defendant sustained five convictions for a variety of offenses, only one of which resulted in a term of incarceration. In 2003, the defendant was convicted of narcotics trafficking in this District and sentenced to a 120-month term of incarceration. The defendant was released from that period of incarceration in 2009. The

defendant's only criminal history point stems from an impaired driving conviction that he sustained in 2014.

### III. Relative Culpability

On June 28, 2023, this Court sentenced Hernandez's co-defendant Charles Guy, a/k/a "Billy Guy" to 87 months' imprisonment for his role in this offense. A table comparing Guy and Hernandez is included below:

| Defendant | CHC | Fentanyl (Quantity) | Cocaine (Quantity) | GL Range | Sentence |
|---|---|---|---|---|---|
| Charles Guy | III | 1,130.4 grams | 0 grams | 87-108 mo | 87 mo |
| James Hernandez | I | 4,000 grams (4 kg) | 18,000 grams (18 kg) | 135-168 mo | |

### IV. Discussion

The Government respectfully submits that given the nature and circumstances of the offense, the defendant's criminal history, and the need for the sentence imposed to afford adequate deterrence to criminal conduct, and to protect the public from further crimes of the defendant, a substantial sentence of imprisonment within the stipulated Guidelines range, including the Guidelines sentence of 135 months' incarceration recommended by Probation, would be sufficient, but not greater than necessary, to serve the purposes of sentencing in this case.

The defendant's conduct is serious and deserves serious punishment. The defendant is not a member of a small, unsophisticated operation. Instead, the defendant was involved in a scheme that spanned multiple states and Mexico. His possession of a kilogram press, three different types of packaging, and at least two different stamps for marking his narcotics also suggests that he is connected with multiple narcotics suppliers and is able to distribute both pressed bricks and powder cocaine and fentanyl. The defendant is also personally engaged in more sophisticated aspects of the narcotics trade: (i) he maintains multiple cellphones for apparent different uses and employs encrypted messaging applications; (ii) as depicted in the photograph of the bricks seized from Cellphone-1, the defendant uses "tokens" — that is, signals — to indicate the legitimacy of the deal to purchasers (in this case, a dollar bill); and (iii) he employs counter-detection techniques, including the use of red pepper flakes sprinkled on top of kilograms of narcotics to deter drug sniffing dogs.[1]

The sheer quantity of narcotics involved in this offense is striking. The defendant and his co-conspirators distributed massive quantities of deadly narcotics including fentanyl. The defendant was the conspirator who rented the apartment that was used to hide and store the drugs he and his co-conspirators prepared for the market and sold, and the quantities of drugs the defendant possessed at the time of his arrest show that the defendant had no plans to stop his

---

[1] The red pepper flakes are visible in the photograph from Cellphone-1, included above.

narcotics dealing anytime soon. The *only* thing that stopped the defendant's participation in this dangerous and highly lucrative crime was his arrest.

In addition to being held responsible for the distribution of 18 kilograms of cocaine—a serious and dangerous drug in its own right—the defendant is also being held responsible for the distribution of 4 kilograms of fentanyl. That equates to over a million deadly doses of fentanyl.[2] As the Court aware, fentanyl trafficking has led to numerous overdose deaths and injuries in recent years which have increased during the COVID-19 pandemic to unprecedented levels. *See, e.g.*, Abby Goodnough, "Overdose Deaths Have Surged During the Pandemic, C.D.C. Data Shows," N.Y. Times, https://nyti.ms/3pyYkyT (April 14, 2021).  Drug overdoses nationwide soared to more than 93,000 in 2020 alone (one of the years that the defendant operated), a then-all-time high, jumping nearly 30% since 2019, with fentanyl continuing to drive the death toll. *See, e.g.,* Lenny Bernstein and Joel Achenbach, "Drug overdose deaths soared to a record 93,000 last year," Wash. Post., https://wapo.st/3xOX1zb (July 14, 2021). In New York City, there were 2,668 fatal overdoses in 2021, an increase of approximately 500 over the 2020 figure and 1,100 over the 2019 figure. *See, e.g.,* Joseph Goldstein and Joshua Needelman, "Fentanyl Helps Push Overdose Deaths to Record Level in New York City," N.Y. Times, https://www.nytimes.com/2023/01/13/nyregion/new-york-overdose-record.html (Jan. 13, 2023).

The defendant is no stranger to the dangerousness of drug trafficking. On September 30, 2003, the defendant pleaded guilty in this District to conspiring to distribute cocaine, in violation of Title 21, United States Code, Section 846. In addition, as explained above, the defendant has been in communication with individuals who have been charged with serious narcotics trafficking crimes in this District. The defendant is not a young man who made a rash decision, ignorant of the possible consequences. Quite the opposite. He is a man in his fifties who has served a significant prior term of incarceration in connection with drug trafficking. Through counsel, the defendant attempts to argue that this offense is nothing more than a desperate act brought on as a consequence of alcohol, marijuana, and financial pressure. But the evidence does not paint the picture of a desperate man. The evidence instead reveals to us a deliberate man who was deeply involved in a sophisticated narcotics trafficking enterprise that was responsible for injecting large quantities of poison into his community for huge profit—as evidenced by the $100,000 and automatic money counter recovered from the Apartment. Simply put, the defendant made a choice to take advantage of people addicted to a devastating drug for "quick money." (Def. Sub. at 3.)

It bears noting that the defendant has demonstrated the ability to maintain legitimate employment. As the defense submission explains, during a previous term of incarceration, Hernandez earned his GED and has since held legitimate jobs and started his own business. Nevertheless, the defendant chose to once again entered into the drug trade rather than continue to participate in society as a law-abiding member.

---

[2] The Drug Enforcement Administration estimates that 3 milligrams of fentanyl is a deadly dose for an average size adult.

As there is a need to deter the defendant from future crimes, so too is there a need for a serious sentence to promote general deterrence and respect for the law. Drug crimes are lucrative, and the number of individuals willing to engage in such crimes for even modest profit is, unfortunately, too high. An incarceratory sentence within the Stipulated Guidelines Range will send the message that the narcotics business is unacceptable and that purveyors of narcotics, especially repeat players like the defendant, will be punished appropriately.

### IV.     Conclusion

For the reasons set forth above, the Government respectfully requests that the Court impose a sentence within the Stipulated Guidelines Range of 135 to 168 months' imprisonment.

Respectfully submitted,

DAMIAN WILLIAMS
United States Attorney for the
Southern District of New York

By: *Ashley C. Nicolas*
Ashley C. Nicolas
Assistant United States Attorney
(212) 637-3677

Cc:     Daniel A. McGuinness, Esq. (via ECF)